Frank MANCHAK, Jr., Plaintiff,

v.

N–VIRO ENERGY SYSTEMS, LTD.; N–Viro International Corporation; N–Viro Energy Systems, Inc.; American N–Viro Resources, Inc.; Sanifill, Inc.; Residuals Processing, Inc.; Redwood Landfill, Inc., Defendants.

No. CV 93–3042–ABC.

United States District Court,
C.D. California.

Dec. 5, 1994.

James W. Colbert, III, O'Melveny & Myers, Los Angeles, CA, Kenneth E. Madsen, Edward T. Colbert, Suzanne M. Parker, Kenyon & Kenyon, Washington, DC, for plaintiff.

Victor G. Savikas, Marsha E. Durko, Maria K. Nelson, Jones, Day, Reavis & Pogue, Los Angeles, CA, Richard M. Kirby, Jones, Day, Reavis & Pogue, Atlanta, GA, Robert C. Collins, Barnes, Kisselle, Raisch, Choate, Whittemore & Hulbert, P.C., Detroit, MI, Joan C. Szuberla, Spengler Nathanson, Toledo, OH, for defendants.

## ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

COLLINS, District Judge.

Defendants' and Plaintiff's motions for summary judgment came on regularly for hearing before this Court on August 29, 1994. At that time, the Court granted Defendants' motion for summary judgment, holding that the N–Viro mixing step did not literally infringe Plaintiff's patent. In a September 19, 1994 status conference the Court indicated it would amend its August 29, 1994 Order to reflect an additional ground in support of its grant of summary judgment for Defendants.

In October 1994, Plaintiff for the first time submitted new evidence to the Court regarding the proper definition of the claim language "deactivated" as that term is used in the art as well as evidence contradicting scientific findings relied on by Defendants. (*See* Affidavit of Betty Olson, filed October 4, 1994). Plaintiff should have provided the Court with this evidence when the parties' motions were first considered. Plaintiff's submission of evidence over a month after the Court's decision was clearly untimely.

Definition of claim language is a matter of law for the Court to decide. In its August 29, 1994 Order, the Court defined "deactivated" as "destroyed." The Court also adopted an ordinary dictionary definition of "deactivated." The Court adopted these definitions because at the time of the initial motion, neither party produced evidence of a particularized meaning of the term "deactivated" within the art. Although Plaintiff's October 1994 submission of the definition of "deactivated" as that term is used in the art was clearly untimely, the Court must neverthe-

less decide cases on their merits. At this point, it would elevate form over substance if the Court required a formal motion for reconsideration (although the Plaintiff does in fact clearly urge reconsideration despite its failure to file a separate motion under that name).

Therefore, the Court has considered the Declaration of Betty Olson and reconsidered its prior Order accordingly. As a result, the Court herein reverses that portion of its previous ruling which granted Defendants' motion for summary judgment, and finds that the Defendants' motion for summary judgment as to the issue of literal infringement must be denied. The Court's denial of Plaintiff's motion for summary judgment of course remains in tact. Thus, it is hereby ORDERED that Defendants' motion for summary judgment as to the issue of literal infringement is DENIED and Plaintiff's motion for summary judgment as to literal infringement is DENIED.

### I. Background

Plaintiff FRANK MANCHAK owns United States Patent No. 4, 079,003 (hereinafter Patent '003) which recites a method for mixing sewage sludge and calcium oxide to make a granular, stabilized, substantially odor-free reaction product. According to Patent '003, sludge is mixed in an enclosed mixing device where an exothermic reaction is initiated to produce a dry, friable, stabilized sludge product that is free from offensive sewage odors. Plaintiff claims that Defendants N–Viro Energy Systems, Ltd. and Sanifill Inc. (hereinafter "Defendants") are literally infringing his patent through their use of "the N–Viro Process."

1. N–Viro has been awarded several U.S. and foreign patents on its process, including U.S. Patent No. 4,902,431.

2. For ease of reference, all Defendants will be referred to as "Defendants" or "N–Viro."

3. According to Defendants, a "pasteurization" process combines alkaline stabilization with drying to kill the undesirable bacteria without substantially affecting beneficial microflora. (Def's Motion at 4).

4. Kiln dust is a waste product from the manufacture of cement or lime. (Nicholson Decl. ¶ 3).

Defendants N–Viro Energy Systems Ltd., N–Viro International Corporation, N–Viro Energy Systems Inc., and American N–Viro Resources, Inc. (collectively the "N–Viro" Defendants) use the "N–Viro Process" to transform sewage sludge into a soil product used for agricultural soil-enhancement or landfill purposes. Defendant Residual Processing Inc. ("RPI") is a licensee of U.S. Patent No. 4,902,431 from N–Viro Energy Systems, Ltd. (Molyneux Decl. ¶ 4–5).[1] Defendant Redwood Landfill, Inc. operates a sludge management facility which utilizes the patent licensed to RPI.[2] Defendants RPI and Redwood Landfill, Inc. are subsidiaries of moving Defendant Sanifill, Inc. (collectively the "Sanifill Defendants").

The "N–Viro Process" treats sewage sludge with alkaline materials which disinfect and deodorize sludge through a process Defendants call "pasteurization."[3] (Def.'s Motion at 4). The "N–Viro Process" involves the following steps: 1) Sewage sludge is dewatered and fed into a mixing device, together with an alkaline admixture typically composed of cement or lime kiln dust.[4] The mixing device is a screw-type mixer in which the dewatered sludge and alkaline admixture are thoroughly mixed together. 2) The mixture exits the screw mixer at a slightly higher temperature than existed upon entry and a pH greater than 12. 3) The mixture is placed in piles entirely exposed to the atmosphere where it remains undisturbed for twelve hours to self-heat. 4) During this "heat pulse" step, Defendants claim that the exothermic reaction between the sludge and the calcium oxide raises the temperature to at least 52 but not more than 62 degrees Celsius to effectively disinfect the sludge. 5) At the conclusion of the "heat pulse" step,

Defendants' "alkaline admixture" is made from cement kiln dust or lime kiln dust. (Def.'s Motion at 5). Kiln dust is a source for calcium oxide. It is undisputed that N–Viro uses calcium oxide as the active ingredient in its alkaline admixture (AA). (See Plaintiff's Opp. Exhibit 2 at NV00760–762 ("CaO is 40–60% of the AA."))

N–Viro's abbreviation for alkaline admixture is sometimes AA and at other times CKD or LKD depending upon the specific chemical content. In all cases, the alkaline admixture contains calcium oxide.

the mixture is dried using a "windrowing" process.[5] (Def.'s Motion at 5–7). Defendants assert the sustained temperature combined with the subsequent windrow drying procedure yields a product in which harmful bacteria are killed.

Plaintiff contends that the *mixing step* (step 1 of the "N–Viro Process") infringes Patent '003. (Plaintiff's Opp. at 3). Patent '003 claims a process for mixing sewage sludge with calcium oxide in an "elongate confined space" through which the sludge/lime substance is longitudinally moved from one end of the confined space to the other. As the substance moves through the mixer, an exothermic reaction occurs to form a reaction product which has a pH of at least 12 and in which the bacteria initially present is deactivated. (Claim 1, Patent '003, 10:53–54).

Asserting that neither the mixing step nor any other portion of the "N–Viro Process" infringes Patent '003, the N–Viro Defendants have moved for summary judgment. The Sanifill Defendants have joined in this motion. In response, Plaintiff submitted a cross-motion for summary judgment urging that N–Viro's mixing step does indeed infringe upon Patent '003.[6]

## II. *Analysis*

### A. *Summary Judgment Standard*

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). Furthermore, if the moving party has the burden of proof at trial, that party must establish peradventure *all* of the essential elements of the claim or defense to warrant judgment in that party's favor. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. at 2553–54. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lob-*

---

5. The "windrowing process" involves placement of the material in long thin piles, and 'turning over' the piles with windrowing machines. This drying process continues for three to seven days. (Nicholson Decl. ¶ 8, Burnham Decl. ¶ 11).

6. Neither party has briefed the issue of infringement by the doctrine of equivalents. Therefore, the Court presumes both summary judgment motions are for literal infringement only. The Court noted footnote 11 of Plaintiff's Reply Brief indicating that the doctrine of equivalents was not the subject of Plaintiff's summary judgment motion. Because neither party briefed the doctrine of equivalents, this Order only applies to literal infringement.

*by, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 248, 106 S.Ct. at 2510. The standard for summary judgment in a patent case is no different; summary judgment is appropriate where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831 (Fed.Cir.1984); *Townsend Eng'g v. HiTec Co.,* 829 F.2d 1086 (Fed.Cir.1987).

### B. *The Motion and Cross-Motion: Infringement*

Plaintiff Manchak bears the burden of proof on infringement. *In re Hayes Microcomputer Prod., Inc. Patent Litig.,* 982 F.2d 1527 (Fed.Cir.1992). To succeed on his summary judgment motion, Plaintiff must show that the undisputed facts establish *every* element of the claim. *Meyers v. Brooks Shoe, Inc.,* 912 F.2d 1459 (Fed.Cir.1990), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020 (Fed.Cir.1992) (emphasis added). Conversely, to succeed in their summary judgment motions, Defendants must demonstrate only that there is an absence of evidence to support Plaintiff's infringement claim. *See Celo-*

*tex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Because Plaintiff has the heavier burden in that he must establish *every element* of his claim, the Court will address Plaintiff's cross-motion first.

### 1. Plaintiff's Cross–Motion

▮ A patented invention is defined by the claims of the patent. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251 (Fed.Cir.1989) (citing *Autogiro Co. of America v. United States,* 384 F.2d 391 (Ct.Cl.1967)). Each element of a claim constitutes a limitation or narrowing of the scope of the claim. D. Chisum, 4 *Patents* § 18.03[4], at 18–54, 55 (1993). To establish literal infringement of a patent, "every limitation [or element] set forth in a claim must be found in an accused product or process." *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1577 (Fed.Cir.1989). "There can be no infringement as a matter of law if a claim limitation is totally missing from the accused device." *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1539 (Fed.Cir.1991). In short, if only one element of a claim is absent in an accused device, the patent in suit is not infringed. *Tol–O–Matic, Inc. v. Proma Produkt-und Mktg. Gesellschaft m.b.H.,* 945 F.2d 1546 (Fed.Cir.1991).

▮ Only Claim 1 of Patent '003 is at issue in this case.[7] To prevail on summary judg-

---

7. Both parties agree that because Claims 2–15 depend upon Claim 1, it follows that non-infringement of Claim 1 by definition means non-infringement of dependent Claims 2–15. *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534 (Fed. Cir.1991). Thus, the Court will focus on the limitations of Claim 1. Claim 1 reads in its entirety as follows:

1. A method of transforming aqueous organic material containing sludge that may include virus and odor forming bacteria and toxic soluble compounds that are converted to substantially insoluble compounds in an alkaline environment into a solid, friable, and substantially odor free reaction product, said method comprising the steps of:

a. sequentially moving said sludge from a source thereof at a first rate;

b. sequentially moving calcium oxide from a source thereof at a second rate, with said second rate so related to said first rate that when sludge and calcium oxide are mixed an exothermic reaction is initialed [sic] in which said sludge and calcium oxide react with the evolution of steam to form a solid, friable, substan-

tially odor free reaction product that has a pH of at least 12 and in which bacteria and virus initially present in said sludge are deactivated by said pH and the heat of said exothermic reaction, and said soluble toxic compounds initially present in said sludge are transformed to substantially water insoluble compounds due to the high pH of the mixture of said sludge and calcium oxide as they transform to said reaction product;

c. providing an elongate confined space that has first and second ends;

d. directing said sludge and calcium oxide at said first and second rates into said first end of said confined space;

e. concurrently mixing and moving the mixture of said sludge and calcium oxide in said confined space from said first end towards said second end thereof, with the rate of longitudinal movement of said mixture in said confined space being such that said exothermic reaction has transformed said mixture to said reaction product by the time said reaction product has reached said second end;

f. withdrawing said steam from said confined space; and

ment, Plaintiff must demonstrate that there are no genuine issues of material fact that the N–Viro mixing step reads on *each* limitation of Claim 1. If there is a genuine issue of material fact as to any one of these limitations, Plaintiff cannot prevail on summary judgment. Despite Plaintiff's showing that many of Patent '003's limitations are present in the N–Viro mixing step, Defendants have presented sufficient evidence to raise a genuine issue of material fact as to the insolubility element found in subparagraph b of Claim 1.

### Insolubility Element

■ Subparagraph b requires the soluble toxic compounds initially present in the sludge to be transformed into substantially water insoluble compounds. (Patent '003, 10:55–57). The first step in determining infringement is interpretation of the claim to ascertain its scope. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861 (Fed.Cir.1985). The claim language regarding solubility is clear and unambiguous. "Words of a claim 'will be given their ordinary meaning, unless it appears that the inventor used them differently.'" *Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948, 950 (Fed.Cir.1993) (quoting *ZMI Corp. v. Cardiac Resuscittor Corp.*, 844 F.2d 1576, 1579 (Fed.Cir.1988)). There is no indication in Patent '003 that the inventor intended to give the language describing the insolubility requirement other than its ordinary and accustomed meaning.

■ Claims are to be construed in light of the patent's specifications. *U.S. v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).[8] The specifications of Patent '003 state "soluble toxic salts of metals such as cadmium, chromium, arsenic, lead and zinc that may be present in the sludge are converted into insoluble compounds when subjected to the high pH that occurs in the confined space as the sludge and calcium oxide react...." (Pltf's Opp., Exhibit 1, at

Col. 9:46–51). Plaintiff offers the Declaration of Professor William Linke which states that it is "elemental in physical chemistry that many metallic salts such as those referred to by name in the specification become insoluble at a pH greater than 7." (Linke Decl. ¶ 12). Linke explains that at pH levels of between 8 and 12, the metals will be substantially insoluble. (*Id.*) It is undisputed that N–Viro's reaction product has "a pH of about 12.3" upon discharge from the mixer.[9] (Burnham Decl. ¶ 7. *See also* Pltf's Opp., Exhibit 2 at NV00754 (alkaline materials are added "to achieve a pH of greater than 12"); NV0076 (alkaline admixture dosage must be sufficient "to achieve a pH of 12....")). Thus, Plaintiff concludes that N–Viro's mixing step meets the insolubility limitation of Claim 1.

However, Defendants assert that N–Viro's mixing step does not transform soluble, toxic compounds into insoluble compounds. Instead, Defendants contend that at a pH level of 12.3, the discharge from the N–Viro mixer contains metallic salts whose solubility is quite high due to a phenomenon called "reverse solubility." (Defs.' Reply at 10.) Defendants offer the Declaration of Professor Jeffery Burnham, who explains that "reverse solubility" means as the pH of a compound increases above 7, the "solubility of heavy metals such as chromium, nickel, zinc and copper decreases *until* the pH increases to a level where the solubility of those metals no longer decreases but begins to *increase* dramatically." (Burnham Decl. 2 ¶ 9). For example, according to this phenomenon, at a pH level of 10, chromium is more soluble than at a pH level of 7. (*Id.*). Thus, when the sludge/CaO substance exits the N–Viro mixer at a pH of 12.3, Defendants contend that the toxic compounds which initially existed are *not* substantially insoluble. (Defs.' Reply at 10).

g. sequentially removing said reaction product from said second end of said confined space.

8. The specification is a written description of the invention and the manner and process of making and using it. 35 U.S.C. § 112 (1988). Generally, the specification details an example or preferred embodiment of the patented device.

9. pH is a measure of acidity/alkalinity of a material, ranging from 0.0 for highly acidic material through 7.0 for a "neutral" material, to 14.0 for a highly alkaline material.

Plaintiff counters that Professor Burnham's conclusions are irrelevant because they pertain to the fact that some metallic salts at high levels of pH become less insoluble than at lower levels of pH in a *basic* environment and Claim 1 does not address this phenomenon. (Plaintiff's Reply at 14). Plaintiff also claims that because solubility is a function of the equilibrium between a particular solvent and its solution, Burnham's graphs are irrelevant because they have nothing to do with the solubility of heavy metals in sludge or sludge after it has begun a reaction with an alkaline source. (Plaintiff's Reply at 5, n. 9) [10]

Not only does the Court lack the expertise to evaluate the credibility of Plaintiff's counter arguments, but more importantly, to do so would be to act as a finder of fact. Therefore, there is a genuine dispute between the parties' experts regarding whether the discharge from the N–Viro mixer "reads on" the substantial insolubility requirement of subparagraph b. This dispute is material because the existence of substantially insoluble compounds in the reaction product is an explicit requirement of the claim language. Thus, Defendants have raised a genuine issue of material fact regarding the issue of solubility. Because Plaintiff must establish the existence of *every* claim limitation to prevail, Defendants' identification of a genuine issue of material fact with regard to solubility precludes Plaintiff's cross-motion for summary judgment. Therefore, Plaintiff's motion for summary judgment is DENIED.

## 2. Defendants' Motion for Summary Judgment

In their Statement of Uncontroverted Facts, Defendants essentially allege that the N–Viro mixing step does not infringe Plaintiff's patent for the following three reasons:

1) the N–Viro mixer does not employ an "elongate confined space" as required by the patent;

2) the N–Viro [mixing] process does not employ an elongated confined state in which the rate of longitudinal movement of material in such confined space is such that an exothermic reaction has transformed the material into a solid, friable, substantially odor-free reaction product by the time the material reaches the second end of the confined space as required by the patent;

3) the N–Viro [mixing] process does not employ the "heat-confining, steam-generating, material-moving, and material-sterilizing functions associated with the 'confined space' of the claims in the patent."

Defendants also allege four additional grounds supporting non-infringement in their Reply Brief:

4) the N–Viro mixing step does not produce a substantially odor free reaction product;

5) the N–Viro mixing step does not destroy bacteria initially present in the sludge;

6) the N–Viro mixing step does not transform soluble toxic compounds initially present into insoluble compounds;

7) the N–Viro mixing step does not generate an exothermic reaction that is substantially complete before discharge from the mixer.

### A. Grounds for Non–Infringement Raised in Defendants' Statement of Uncontroverted Facts

■ The Court finds that Plaintiff has successfully presented a genuine issue of material fact as to Defendants' first three grounds of non-infringement.[11] With respect to the dimensions of the mixer itself, the Court accepts the ordinary meaning of an "elongate confined space" to be a lengthened or stretched-out area having certain boundaries. Figure 14 of Patent '003 illustrates that the

---

10. Plaintiff points to three of N–Viro's own documents as evidence of the increased insolubility of heavy metals. (Plaintiff's Reply at 15). However, the first two of these three documents refer to results from the N–Viro "process" as a whole, and not from the mixing step. (Plaintiff's Reply, Exhibit 12, Bates No. 0241).

11. The Court will not address Defendants' argument regarding the absence of "sterilization" in its mixing step, because this term is not found in the claim language.

claim language covers a vertically-disposed hopper that feeds into one end of a substantially horizontal chamber with an outlet at the opposite end. Plaintiff has produced sufficient evidence to establish that a reasonable jury could find based on the diagrams and language in Defendants' own literature as well as Defendants' own admissions that the N–Viro mixer is an "elongate confined space" as required under Claim 1. (*See* Burnham Decl. ¶ 6, Plaintiff's Opp., Exhibit 2 at NV00822–824, Exhibit 6 at B10426 (stating "mixing unit should be enclosed to prevent release of dust. . . .")).

To the extent that Defendants' second ground addresses the odor of the reaction product, it overlaps with their later contention that the discharge from the N–Viro mixer is not substantially odor free. Thus, the Court will address that portion of ground two later.

Plaintiff has, however, established that there are genuine issues of material fact concerning the remaining elements of ground two. Plaintiff has made a sufficient showing that the movement of material in the N–Viro mixer is such that an **exothermic reaction** [12] transforms the sludge/CaO material into a **solid, friable reaction product** by the time the material exits the mixer. Plaintiff has presented two reasons why genuine issues of material fact exist as to this ground. First, Plaintiff demonstrates that there is an increase in temperature, indicating the initiation of an exothermic reaction, between the

time the sludge/CaO material enters and exits the N–Viro mixer. (Linke Decl. ¶ 9, Faulmann Decl. ¶ 12, Burnham Decl. ¶ 7, Plaintiff's Opp., Exhibit 2, NV00778 (stating that "an exothermic reaction occurs when AA is mixed with wet sludge cake"), NV00754 (stating "the sludge heats up as a result of exothermic reactions from the alkaline materials")).[13] Second, Plaintiff shows a reasonable jury could find that the reaction product of the N–Viro mixer is solid and friable. (Plaintiff's Opp., Exhibit 2 at 756, Exhibit 6 at B10425–B10426).[14] Thus, Plaintiff has successfully established that there is a genuine issue of material fact regarding the existence of an exothermic reaction in the mixer and the production of a solid, friable reaction product.

■ Defendants also allege in their Statement of Uncontroverted Facts that the N–Viro mixing step does not produce the evolution of steam as required by subparagraph b. "Steam" is defined as "vapor arising from a heated substance." *Webster's Ninth New Collegiate Dictionary* at 1153.[15] Plaintiff has made a showing that vapor does rise as a result of the heated sludge/CaO substance within Defendants' mixer. (Plaintiff's Opp., Exhibit 3 at 142 ("heat produced by the CKD-amended sludge creates a chimney effect which carries large amounts of *steam,* ammonia and dust to the top . . ."); Plaintiff's Opp., Exhibit 7 at 155, ln. 12–14, Plaintiff's Opp., Exhibit 10 at 166, ln. 7–10, 25). Thus, Plaintiff has successfully established

---

**12.** An "exothermic reaction" is a chemical reaction that **gives off heat,** the most obvious indicator of which is a temperature increase without any other energy being put into the system. (e.g. no heating of the contents) Linke Decl. ¶ 8.

**13.** Professor Ervin Faulmann testified that there is no substantial increase in the temperature of the sludge/alkaline admixture as a result of any chemical reaction in the mixer. (Faulmann Decl. ¶ 13). Although Faulmann attributed the temperature increase primarily to the high temperature of the alkaline admixture, he nevertheless *acknowledged* that there is a 5 degree Celsius rise in temperature between the time the sludge enters and exits the mixer. (*Id.* at 12).

Because it appears Faulmann and Linke disagree as to whether the temperature increase is due to an exothermic reaction or the high temperature of the alkaline admixture, there is a genuine issue of material fact as to this issue. (*See*

Linke Decl. ¶ 9 stating that all the temperature increase occurs in the first 45–60 seconds and that therefore, an exothermic reaction is initiated in the mixer).

**14.** The dictionary defines friable as "easily crumbled or pulverized." *Webster's Ninth New Collegiate Dictionary,* at 493.

**15.** A court may employ texts, such as dictionaries, to illuminate the usage of disputed claim terms. *Eltech Sys. Corp. v. PPG Indus., Inc.,* 903 F.2d 805 (Fed.Cir.1990) (none of the terms [used] need to be given anything other than their ordinary dictionary definition to be read consistently with the specification).

Plaintiff correctly asserts that neither the claim language nor the specifications make mention of "boiling," which would require the attainment of a particular temperature inside the mixer.

that there is a genuine issue of material fact regarding whether the N–Viro mixer produces steam as required by the claim language.

### B. Grounds for Non–Infringement Raised in Defendants' Reply Brief

In their Reply Brief, Defendants alleged four additional grounds which purportedly establish that the N–Viro mixer does not read on the limitations of Patent '003. A proper assessment of these grounds requires the Court to engage in claim interpretation. "Where ... no underlying fact issue must be resolved, claim interpretation is a question of law." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed.Cir. 1989). As such, claim interpretation may be resolved by the court on summary judgment. *Id.* at 1580. To ascertain the meaning of disputed claim language, the court may look to the claim language, the specifications (including any drawings), and the prosecution history. *Smithkline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878 (Fed.Cir. 1988).

### 1. Substantially Odor–Free Reaction Product

First, Defendants argue that the N–Viro mixing step does not produce a "substantially odor free" reaction product as required by subparagraph b. (Defendants Reply at 4–6). Defendants have provided evidence that the discharge from the N–Viro mixer has an "overwhelming smell of toxic ammonia." (*See* Plaintiff's Opp., Exhibit 2 at NV00811–12, Burnham Decl. No. 2 ¶ 7 at 5:11–12). Plaintiff, however, contends that the phrase "substantially odor free" refers to the elimination of the "objectionable odor of sewage sludge." (Plaintiff's Opp. at 18–19). Thus, the Court must interpret the claim language to determine whether the phrase "substantially odor-free" means the reaction product will be free of *any* odor, i.e. odorless, or that the reaction product will no longer emit the odor of sewage sludge.

The specification illuminates the meaning of "odor free" stating, "the objectionable odor of sewage sludge is substantially eliminated...." As a general rule, claims are to be construed in light of the specifications. *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). Given the reference in the specification and the fact that the purpose of Patent '003 is to deodorize sewage sludge, the Court is persuaded that the phrase "substantially odor free" means free of sewage odor. Moreover, the claim's prefacing of "odor-free" with the term "substantially" implies the continuing existence of at least some odor. Thus, the smell of ammonia is not inconsistent with the term "substantially" because that term negates an interpretation that the discharge is devoid of any and all odor.

Because Defendants do not allege that discharge from the N–Viro mixer retains the smell of sewage, Defendants' reaction product meets the "substantially odor free" requirement under subparagraph b. Thus, Defendants cannot prevail on summary judgment based on this ground.

### 2. Deactivation of Bacteria in the Reaction Product

Subparagraph b requires a reaction product in which bacteria and virus initially present in the sludge are "deactivated." (Patent '003 10:53–54). Defendants argue that their process does not meet this limitation because the N–Viro mixing step does not destroy bacteria and virus initially present in the sludge. (Defendants' Reply at 7). According to Defendants, upon discharge from the N–Viro mixer, the reaction product still contains 4 billion bacteria which are capable of multiplying by division. (Hatfield Decl. ¶ 6). In addition, Defendants allege that the 1 log reduction in bacteria that occurs in the N–Viro mixer is microbiologically insignificant. (Hatfield Decl. ¶ 7).[16]

Plaintiff counters that the N–Viro mixing step does deactivate bacteria in the reaction product. Plaintiff points out that 21 billion bacteria die in the mixer and within 20 hours

---

16. Moreover, Hatfield stated that much of the reduction of total bacteria resulted from dilution of the sludge by the alkaline admixture and not the actual killing of bacteria. (Hatfield Decl.

¶ 8). If one takes into account the dilution component, only 50.6% of the bacteria was actually killed in the N–Viro mixing step. *Id.*

of discharge there is a 4 log reduction in total bacteria count. (Plaintiff's Opp., Exhibit 3, Hatfield Depo. at 000031).

Because the meaning of the term "deactivated" is dispositive, the Court must first interpret this term as it is used in the claim language. "Deactivated" is undefined in the claim language itself. Relying on the specification, however, Defendants contend that "deactivated" means "destroy."[17] Although appearing to use the terms "deactivate" and "destroy" interchangeably, Plaintiff states that the word "deactivate" implies that destruction may not yet be complete upon departure from the mixer. "Ordinarily, the test for interpreting the meaning of a claim term is determined from the vantage point of one skilled in the art." *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1578 n. 4 (Fed.Cir.1993); *See also Smithkline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 882 (Fed.Cir.1988) ("Claims should be construed as one skilled in the art would construe them.").

In October 1994, Plaintiff made an untimely evidentiary submission of the meaning of the term "deactivate" within the art. Dr. Betty Haak Olson testified that in microbiology "deactivate" does not mean to "kill" or "destroy" immediately or within any specified time period. Affidavit of Betty Olson at ¶ 5–6. According to Olson, in microbiological terms, "deactivation" covers a range of effects. Olson testifies as follows:

> "Deactivation" can be interchangeable with the term "bacteriostatic" which implies temporary inactivation of bacteria. That is often accomplished by creating a chemical medium in which the bacteria are rendered incapable of replication. The chemical medium will also generally result in the destruction of much of the bacteria, as well as the deactivation of the rest.

Olson Affidavit at ¶ 6. Olson testified she understands the technical definition of "deactivate" to be the same as that contained in the technical dictionary definition, which is "to render inactive or less reactive; spec. to deprive of chemical action, to render less chemically reactive." Olson Decl. at ¶ 5 *citing* The Oxford English Dictionary IV (2d ed. 1989) at Exhibit 2 attached to "Plaintiff's Response to Defendants' Supplemental Brief In Support of Defendants' Motion for Summary Judgment." Defendants have not provided the Court with evidence of any contrary definition which "deactivate" possesses in the art.[18] Thus, because claims are to be given their ordinary and accustomed meaning to one skilled in the art, the Court will adopt Olson's definition of "deactivate" as that term is used in the art. Under this definition of "deactivated," the bacteria in the reaction product need not be "killed" or "destroyed" within any particular time period. Rather, the bacteria need only be rendered "inactive or less reactive" or "deprived of chemical reaction or rendered less chemically reactive."

Defendants, relying on the "destroyed" definition of "deactivated," have produced evidence that approximately 4 million bacteria remain in their reaction product upon discharge from the N–Viro mixer and that such bacteria are capable of multiplying by division. (Hatfield Decl. at ¶ 6). Because the Court has determined that the term "deactivated" does not mean to kill or destroy immediately or within a specified time period, the mere presence of bacteria in the discharge of the N–Viro mixer is insufficient to establish non-infringement.

However, Defendants argue an alternative basis for non-infringement. Defendants argue that the remaining bacteria in the discharge from the N–Viro mixer are not rendered "chemically inactive," but rather are capable of division or replication. Defendants have produced the findings of Dr. Hatfield that the N–Viro product contains bacteria which are capable of division or replication. (*See* Hatfield Decl. at ¶ 6, filed July 29, 1994). Such replication would be inconsis-

---

**17.** The specification states that the change in pH together with the increased temperature resulting from the exothermic reaction "destroys bacteria and virus present in the sludge." (Col. 9:41–42).

**18.** Instead, Defendants contend that the term "deactivated" has no meaning whatsoever in the art. *See* Defendants' Reply Mem. in Support of their Motion for Summary Judgment at 7 citing Burnham Dep. 121:11–12.

tent with the adopted definition of "deactivate," which is to render chemically inactive.

However, Plaintiff has produced evidence contradicting Defendants' findings. Plaintiff's expert, Dr. Olson, challenges the validity of the Hatfield findings on which Defendants rely. Olson contends that if a chemical substance which is deactivating bacteria is removed from the environment, through dilution or by placing the bacterial-laden material in a compatible broth or solid medium, it is possible to reverse the deactivation of the remaining bacteria. Olson Decl. at ¶ 8. Olson questions the testing used to arrive at the Hatfield findings, stating:

> "it appears from the Hatfield Declaration and the accompanying materials, that this [removal of deactivating substance] was done in trying to achieve test growth. That test growth would not be indicative of the state of bacteria in the stabilized sludge/calcium oxide mixture."

Olson Decl. at ¶ 8. Olson is suggesting that the replication of bacteria observed by Hatfield in Defendants' reaction product may have been due to the removal of the chemical substance which was deactivating the bacteria, thereby reversing the deactivation of the remaining bacteria. According to Olson, such removal to achieve test growth is not indicative of the state of the bacteria when it is left in the stabilized sludge/calcium oxide mixture. Dr. Olson's testimony thereby calls into question the validity of the Hatfield test demonstrating that bacteria remaining in Defendants' reaction product are capable of chemical activity such as replication.

Defendants respond that even if Dr. Olson's criticisms of Ms. Hatfield's methodology are correct, these criticisms only attack the coliform bacteria and have no bearing on the total number of bacteria reported. (See Hatfield Decl. at ¶ 3, Exh. 1 attached to Defendants' Reply Brief in Support of Motion for Summary Judgment on Doctrine of Equivalents, filed Nov. 28, 1994). However, this response only confirms that the parties are embroiled in a "battle of the experts"

concerning the methods and procedures used in the Hatfield findings. Faced with this dispute, the Court cannot rely on Defendants' assertion that bacteria in their reaction product are capable of multiplying by division. Because the Court cannot determine credibility or otherwise act as a finder of fact, summary judgment is not proper where there is an evidentiary conflict over a material fact. *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147 (Fed.Cir.1986); *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir.1985). Moreover, despite the admittedly speculative nature of Dr. Olson's criticisms, on a motion for summary judgment the evidence must be viewed in favor of the non-movant and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).[19] The Court finds that based on Dr. Olson's criticisms, a reasonable jury could find that the Hatfield findings are unreliable. Thus, because there is a genuine issue of material fact as to whether the bacteria in the discharge from the N–Viro mixer are "deactivated" as that term is defined in the art, Defendants cannot prevail on summary judgment on this ground.

### 3. Substantial Completion of the Exothermic Reaction

Defendants also allege that Patent '003 requires the exothermic reaction to be *substantially completed* before the sludge/CaO substance exits the mixer. ('003 Patent Col. 9:56). Defendants base this allegation on a reference in the specifications which states the exothermic reaction is "substantially completed prior to the reaction product reaching an opening ... [where it] discharges." This specification effectively imposes a limitation of "substantial completion" on the exothermic reaction. However, no such limitation is contained in the claim language. The Federal Circuit has repeatedly stated that specifications cannot place limitations on the claim language. *Sjolund v. Musland,*

---

**19.** In a motion for summary judgment, all reasonable inferences must be drawn in the opposing party's favor both where the underlying facts are undisputed and where they are in controversy. At the summary judgment stage, the nonmovant's "version of any disputed issue is presumed correct." *Eastman Kodak Co.*, 504 U.S. ——, 112 S.Ct. at 2077.

847 F.2d 1573 (Fed.Cir.1988) ("While claims are to be interpreted in light of the specification, ... it does not follow that limitations from the specification may be read into the claims"); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981 (Fed.Cir.1988) ("What is patented is not restricted to the examples, but is defined by the words in the claims."); *Rawplug Co. v. Illinois Tool Works, Inc.*, 11 F.3d 1036 (Fed.Cir.1993).

The claim language of Patent '003 does not impose parameters on the progress the exothermic reaction should achieve before the reaction product exits the mixer. On the contrary, the explicit claim language indicates that *commencement* of the exothermic reaction is sufficient under subparagraph b. Subparagraph b states "with said second rate so related to said first rate ... that an exothermic reaction is *initialed* [sic]...." Use of the term "initialed" signifies an intent that the exothermic reaction need only *start*, not be substantially completed, under the claim language.[20]

In fact, the only indication of the requisite progress the exothermic reaction must achieve while inside the mixer is found in subparagraph b's definition of the "reaction product." Subparagraph b indicates that the reaction product is solid, friable, odor-free with a pH of at least 12, and of most relevance for this analysis, contains "deactivated" bacteria when it exits the mixer. Because the exothermic reaction is partially responsible for this deactivation of bacteria, it therefore follows that, while inside the mixer, the exothermic reaction must at least progress to the point of deactivating such bacteria before the reaction product is expelled. Rather than require substantial completion of the exothermic reaction, the claim language requires only that a sufficient share of the exothermic reaction occur inside the mixer to effect deactivation of bacteria in the reaction product. There is no requirement in the claim language that the exothermic reaction be substantially completed, partially completed or fully completed before such deactivation can occur.[21] Because there is no requirement in the claim language that the exothermic reaction be substantially completed, Defendants cannot prevail on summary judgment on this ground.

### 4. Solubility of Compounds in Reaction Product

Defendants also allege that upon departure from the N–Viro mixer, the metallic salts present in the reaction product are not substantially insoluble. As discussed supra, there is a genuine issue of material fact regarding this issue due to the conflicting testimony of experts Linke and Burnham. (*See supra* at 1128).

### Conclusion

For the reasons stated above, the Court concludes that Plaintiff has failed to demonstrate that the N–Viro mixing step infringes Patent '003. Therefore, Plaintiff's Cross–Motion for summary judgment is DENIED. The Defendants have also failed to demonstrate that the N–Viro mixing step does not literally infringe Patent '003. Therefore, Defendants N–Viro and Sanifill's motions for summary judgment are DENIED.

**SO ORDERED.**

---

**20.** "A specification can supply understanding of unclear terms, but should never trump the clear meaning of claim terms...." *North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571 (Fed.Cir.1993) (Rader, dissenting), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994).

**21.** As discussed *supra*, there is a genuine issue of material fact concerning whether the bacteria has been "deactivated" by the time of its discharge from the N–Viro mixer. Because it is unclear whether the bacteria in the discharge from the N–Viro mixer is "deactivated," the Court is unable to ascertain whether the progression of the exothermic reaction inside the N–Viro mixer is consistent with Patent '003's claim language.