**HEWLETT–PACKARD COMPANY,**
**Plaintiff–Appellant,**

v.

**REPEAT–O–TYPE STENCIL MANUFAC-TURING CORPORATION, INC. and Fred Keen, Defendants–Appellees.**

No. 96–1379.

United States Court of Appeals,
Federal Circuit.

Aug. 12, 1997.

Rehearing Denied; Suggestion for Rehearing In Banc Declined
Oct. 14, 1997.

S. Leslie Misrock, Pennie & Edmonds, New York City, argued, for Plaintiff–Appellant. With him on the brief were Jonathan A. Marshall, William G. Pecau, Steven I. Wallach, Alan Tenenbaum, and Neer Gupta. Of counsel on the brief were Morgan Chu and Bruce D. Kuyper, Irell & Manella LLP, Los Angeles, CA, and William H. MacAllister and Edward Maker II, Hewlett–Packard Company, Palo Alto, CA.

Edward F. O'Connor, Poms, Smith, Lande & Rose, Irvine, CA, argued, for Defendants–Appellees.

Before ARCHER, Chief Judge, MAYER, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Hewlett–Packard Company (HP) appeals from the summary judgment of the United States District Court for the Northern District of California, holding that Repeat–O–Type (ROT) does not infringe any of the asserted patents by modifying and reselling HP's ink jet cartridges. *Hewlett–Packard Co. v. Repeat–O–Type, Inc.,* No. 92–CV–3330 (N.D.Cal. Apr. 17, 1996). Because ROT's modification does not constitute impermissible reconstruction and because HP has failed to raise genuine issues of material fact regarding infringement of any of the patents in suit, we affirm.

## BACKGROUND

HP manufactures and sells ink jet printers and disposable ink jet cartridges for its printers. Before running out of ink, the cartridges can print approximately 200 to 2000 pages, depending on the cartridge used

and the nature of the printing being performed. Once the ink in a cartridge has been depleted, HP expects the cartridge to be discarded and replaced by a new one. Instructions accompanying the cartridges disclaim liability for printer damage caused by refilling and advise the user to "discard old print cartridge immediately."

The HP cartridges use thermal ink jet printing technology in which ink is transferred, drop-by-drop, onto paper, overhead transparencies, or other similar media. Specifically, the cartridges employ a printhead containing thermal resistors that are fabricated within a thin-film-semiconductor substrate and heat and propel ("jet") tiny droplets of liquid ink onto a medium, such as paper. The cartridges also contain an ink reservoir that stores the ink transferred to the printhead during printing. During the ink jet printing process, the printer's electronics provide electrical energy to the cartridge, which conducts the energy through the thermal resistors in the printhead, causing the thermal resistors to heat. As a result, the ink which is delivered to the resistors boils and forms a vapor, which causes nearby ink droplets to be propelled out of the cartridge and onto the paper or other medium. HP warns its customers that refilling the cartridges may reduce print quality due to clogging of the printhead nozzles, corrosion of the cartridge electronics, or incompatibility of non-approved inks with the cartridges.

HP owns numerous patents on various facets of ink jet printing technology, including patents on ink jet printers, cartridges, and ink formulations. Twelve of these patents are involved in this suit. Of the twelve asserted patents, two of them, U.S. Patents 4,827,294 and 4,931,811, are directed to ink jet cartridges (referred to in the patents as "ink jet pens") and a third, U.S. Patent 5,108,503, is directed to a specific ink formulation. The remaining patents are directed to other aspects of ink jet printing technology and are directed to specific components within ink jet cartridges: U.S. Patents 4,347,524 (shock absorption of an ink supply tube); 4,635,073 (thermal printhead); 4,683,-481 (thermal resistors in substrate); 4,771,-295 (process for filling an ink jet cartridge with ink); 4,794,410 (thermal resistor structure); 4,794,411 (ink propulsion from printhead); 4,812,859 (multichamber ink jet pen); 4,862,197 (thin-film-resistor printhead); and 4,872,027 (printer and ink jet printhead and their interconnection).

The '294 patent, entitled "Thermal Ink Jet Printhead Assembly Employing Beam Lead Interconnect Circuit," is directed to an "ink jet pen" (i.e., a cartridge), which forms an improved electrical connection between the printhead of the pen and the ink jet printer carriage in which the pen is mounted.

Claim 3 of the '294 patent, which is representative, reads as follows:

An ink jet pen including in combination:

(a) a pen body housing having an ink storage compartment therein and an ink flow port adjacent one surface thereof and further having outer surfaces which are contoured to mate with adjacent surfaces of a pen carriage member,

(b) a thin film printhead mounted on said one surface of said pen body housing and adjacent to said ink flow port therein for receiving ink from said ink flow port during an ink jet printing operation, and

(c) a flexible electrical circuit member including a plurality of beam leads bonded at predetermined locations on said thin film printhead for supplying electrical power and signals thereto during an ink jet printing operation, said flexible electrical circuit being extended over one of said contoured outer surfaces of said pen body housing and secured thereto, whereby electrical conductors in a pen carriage are adapted to mate with certain ones of said beam leads of said flexible electrical circuit for supplying power and electrical drive signals to said beam leads when said pen body housing is mounted in said carriage.

The '811 patent, entitled "Thermal Ink Jet Pen Having A Feedtube With Improved Sizing And Operational With A Minimum Of Depriming," is directed to an "ink jet pen" that uses a "standpipe" to improve the connection between the ink reservoir and the printhead.

As illustrated in the accompanying diagram from the '811 patent, the pen body construction includes a pen body housing (10) and a cap (28). The pen body also includes a foam storage material (12) which serves as the ink

As illustrated in the accompanying diagram from the '811 patent, the pen body construction includes a pen body housing (10) and a cap (28). The pen body also includes a foam storage material (12) which serves as the ink reservoir, a standpipe formed by walls (20) and (22), and a printhead (18). The cap (28) has an air vent tube (30) for supplying air to the ink reservoir as ink is transferred through the standpipe to the printhead. The patented invention improves on the prior art by providing a standpipe that prevents air bubbles from impeding the flow of ink to the printhead.

Claim 2 of the '811 patent, which is representative, reads as follows:

2.  A thermal ink jet pen including an ink reservoir therein, and a thin film printhead interconnected to said reservoir by way of a standpipe, with said standpipe having an air accumulating section at the ink receiving end thereof and said thin film printhead including an orifice plate with a plurality of orifii therein of a known radius, $r_{nozzle}$ characterized in that the minimum acceptable radius, r, of said air accumulating section of said standpipe satisfies the equation $r/r_{nozzle} \$ 100$.

The '503 patent, entitled "Smear Resistant Inks For Ink jet Printers," is directed to an ink formulation. Claim 2 depends from claim 1, which has recently been disclaimed, and adds the following limitation: "The ink of claim 1 which is buffered to a pH from about 6 to about 9." Likewise, claims 15 and 19 are limited to formulations containing "sufficient ammonium acetate ... to provide an ink with a pH from about 7 to about 7.5...." The other asserted claims, 3, 8, 10, 16, and 18, depend from either claims 2 and 15 and thus incorporate the pH limitations.

ROT purchases two types of HP ink jet cartridges, model HP 51625A (known within HP as the "Kukla" cartridge) and model HP 51608A (known within HP as the "Stanley" cartridge). The Kukla cartridge is designed for color printing and contains three reservoirs which hold inks corresponding to the three primary subtractive colors. The Kukla cartridge includes a cap that is ultrasonically welded to the rest of the body of the cartridge, the cap being designed to permit small amounts of air to enter the ink reservoir. The Stanley cartridge, on the other hand, has a single reservoir and is sold by HP with black ink only. It is designed for use with the DeskJet and DeskWriter family of ink jet printers and for the HP FAX–300 ink jet fax machine. The Stanley cartridge includes a hole that is used to fill the ink reservoir at the time of manufacture and also allows air to enter the reservoir during printing.

The Kukla and Stanley cartridges were designed to be non-refillable. As James M. Martin, a product manager for HP, stated, because "refilled cartridges present significant problems of resistor lifetime, nozzle clogging and air bubble formation, the cartridges are not intended to be refilled. Accordingly, the user instructions in the Kukla and Stanley cartridges advise the user to 'Discard old print cartridge immediately.'" ROT has chosen to disregard HP's advice. ROT purchases Kukla and Stanley cartridges, modifies them so that they will be refillable, and then resells them as refillable ink jet cartridges. As HP concedes, ROT starts with brand-new and unused HP cartridges. It does not modify "spent" cartridges. ROT clearly describes the cartridge modification in its own patent, U.S. Patent 5,408,256, entitled "Refillable Color Ink Jet Cartridge And Method For Making Said Cartridge:"

A non-refillable color ink jet cartridge such as the Hewlett-Packard #51625A can be converted into a refillable cartridge. The upper portion of this cartridge contains the three air vent/ink refill holes, and this upper portion has a plastic cap capable of being removed. After placing the body of the plastic cartridge on a suitable support such as, for example, the edge of a table, the protective plastic cap covering the upper portion of the cartridge can be removed by prying it off of a cartridge with a sharp instrument such as a knife.

. . .

The upper protective cap [26] can now be modified so that it can be placed snugly back onto the main cartridge body [12] as often as is necessary to replenish depleted ink supplies. A variety of methods can be employed to do this, including placing two adhesive backed pads [36 and 38] at both sides of the longitudinal length of the upper protective cap.

**Figure 3 from the '256 Patent**

'256 Patent, col. 1, line 56 to col.2, line 18. ROT sells the modified refillable ink jet cartridges in kits which also contain bottles of refillable ink. The refillable ink is not manufactured or supplied by HP. In addition to modifying the cartridges, ROT replaces the black ink of Stanley cartridges with a variety of color inks and resells them as color cartridges.

In 1992, HP filed suit against ROT after learning that ROT was selling refillable ink jet cartridges. In its original complaint, HP sued ROT for trademark infringement, unfair competition, and other non-patent causes of action. Shortly thereafter, HP amended its complaint to assert that ROT's modification and resale of the cartridges infringed eleven HP patents pertaining to ink jet car-

tridges. HP also amended the complaint to assert that the inks sold by ROT infringed one of HP's ink patents and to add Fred Keen, ROT's president and majority stockholder, as a defendant.

ROT moved for summary judgment of non-infringement of all of the asserted patents, and HP moved for summary judgment of infringement on the trademark claims and on two of the patent claims. HP asserted that ROT's resale of the modified Stanley cartridge infringed the '811 patent and that ROT's resale of the modified Kukla cartridge infringed the '294 patent. After hearing arguments on the cross-motions for summary judgment, the district court ruled in favor of HP on the trademark infringement claims

and in favor of ROT on the patent infringement claims. The trademark ruling was not appealed.

With regard to patent infringement, the district court first stated that, in light of HP's sale, ROT had the right to use and resell Kukla and Stanley cartridges that were lawfully purchased. The court then considered whether ROT's modification created an infringing product. The court noted that ink was not an element of the claimed invention of the '811 patent. Thus, the court held that ROT's replacement of the ink, a non-patented component, in the Stanley cartridge was not patent infringement.

As for the '294 patent, the court noted that the cap is not an element of the claims and held that "breaking the seal of the cap and replacing the cap with shims so that the cap could be removed and the cartridge refilled by the consumer, does not constitute impermissible 'reconstruction.'" Finally, holding that HP failed to present sufficient evidence of infringement to create any genuine issues of material fact, the court ruled that ROT was entitled to judgment of non-infringement on all the patent claims as a matter of law. Finding no just reason for delay, the district court entered final judgment on the patent claims pursuant to Fed.R.Civ.P. 54(b). HP now appeals to this court. We have jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(1) (1994).

## DISCUSSION

■ We review a district court's grant of summary judgment *de novo*. *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). Summary judgment is appropriate when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent. *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1274, 35 USPQ2d 1035, 1038 (Fed.Cir.1995).

### A. The '294 and '811 Patents

■ The patent statute provides that "whoever without authority makes, uses, . . . or sells any patented invention, in the United States . . . during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a) (1994). Infringement thus not only requires that claims read on accused devices, but also requires that the accused devices be made, used, or sold without authority. Thus, even if the patents in suit read on the accused cartridges, there is no infringement if ROT acted "with authority" granted by HP's unconditional sale of the cartridges in question.

HP argues that ROT's modification and resale of the Stanley and Kukla cartridges infringes the '294 and '811 patents. HP first asserts that the district court erred in its interpretation of the claims of the '294 and '811 patents and that this error infected the district court's infringement analysis. Specifically, HP argues that the district court erred by holding that the "patents are not for the [ink jet] cartridges themselves; they are for certain elements which are *in* the cartridges" (emphasis in original).

HP also argues that ROT's modification creates new cartridges because the modified cartridges have different properties, different features, and different performance characteristics compared with the cartridges sold by HP. HP contends that because ROT sells cartridges that differ from the cartridges purchased from HP, the cartridges are "new," not "authorized," and therefore infringe. HP emphasizes that, although the cap is not explicitly recited in the claims, the cap on the Kukla cartridge is part of the "pen body housing" recited in claim 3 of the '294 patent. Thus, HP argues, modification of the cap necessarily involves modification of the claimed "pen body housing" and thus the use and sale after such modification is an infringement. Similarly, HP argues that the cap of the Stanley cartridge is part of the claimed "ink reservoir" of claim 2 of the '811 patent.

ROT responds that refilling the ink in the cartridges cannot constitute infringement, because, while HP may have a patent on the cartridge, *i.e.*, the container, HP does not

have a patent on the contents of the container, specifically, the ink. ROT further argues that the replacement of components of the cartridges that are not specifically recited elements of the asserted claims cannot be considered a "manufacture" of the claimed inventions. ROT argues that because neither the cap nor the ink are recited elements of the claims, their modification or replacement cannot constitute infringement.

■ We agree with HP that the court misconstrued the claims. They relate to ink jet cartridges, not to specific components within the cartridges. The preamble of each claim clearly states that it relates to an "ink jet pen including" the recited limitations. The claim term "including" is synonymous with "comprising," thereby permitting the inclusion of unnamed components. Thus, claim 3 of the '294 patent, for example, reads on ink jet pens that contain the recited pen body housing, thin film printhead, and the flexible electrical circuit member. If these three elements can be identified in ROT's cartridges, then such cartridges are within the scope of that claim and the unauthorized manufacture or sale of such a cartridge infringes the claim.

Although the district court did not construe the claim terms "pen body housing" or "ink reservoir," and hence did not consider whether modification of the cap results in a modification of specific elements of the claims, for purposes of our inquiry into ROT's "authority," we will assume that HP's patents read on ROT's modified cartridges. We will also assume that modification of the cap involves "making" the "ink jet pens" claimed in the '294 and '811 patents. The question before us is whether this modification is authorized, or whether it exceeds the scope of the implied license granted to ROT and subsequent purchasers by the sale of the ink jet cartridges.

■ Generally, when a seller sells a product without restriction, it in effect promises the purchaser that in exchange for the price paid, it will not interfere with the purchaser's full enjoyment of the product purchased. The buyer has an implied license under any patents of the seller that dominate the product or any uses of the product to which the parties might reasonably contemplate the product will be put. *See Mitchell v. Hawley,* 83 U.S. (16 Wall.) 544, 548, 21 L.Ed. 322 (1872) ("Complete title to the implement or machine purchased becomes vested in the vendee by the sale and purchase.... Patented implements or machines sold to be used in the ordinary pursuits of life become the private individual property of the purchasers, and are no longer specifically protected by the patent laws....").

■ The authority to use and sell a purchased device, however, does not include the right to make a new device or to reconstruct one which has been spent. Reconstruction, *i.e.,* the re-creation of a patented combination, is an infringement because such activity is beyond the implied authorization to use and sell a patented device. As the Supreme Court has stated:

> The decisions of this Court require the conclusion that reconstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to 'in fact make a new article,' after the entity, viewed as a whole, has become spent. In order to call the monopoly, conferred by the patent grant, into play for a second time, it must, indeed, be a second creation of the patented entity.... Mere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property.

*Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 346, 81 S.Ct. 599, 604, 5 L.Ed.2d 592, 128 USPQ 354, 359 (1961) ("*Aro I*") (citations omitted). On the other hand, one does have authority to repair a patented device that he has purchased. This case raises the question whether the modification of the HP cartridges by ROT is repair, as the district court implicitly held, or is tantamount to reconstruction, as HP urges.

It is undisputed that HP sold and ROT purchased the Kukla and Stanley cartridges without restriction; HP has not alleged that ROT breached any contract affecting the transaction. When HP (or an agent with authority to sell) sold the cartridges, HP parted with the right to enforce any of its patents relating to the cartridges thus sold to exclude the purchaser from using or selling them. *See Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 484, 84 S.Ct. 1526, 1531, 12 L.Ed.2d 457, 141 USPQ 681,

685 (1964) ("*Aro II*") ("[I]t is fundamental that sale of a patented article by the patentee or under his authority carries with it 'an implied license to use.'") (quoting *Adams v. Burke,* 84 U.S. (17 Wall.) 453, 456, 21 L.Ed. 700 (1873)); *United States v. Univis Lens Co.,* 316 U.S. 241, 249, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408 (1942) ("An incident to the purchase of any article, whether patented or unpatented, is the right to use and sell it....."); *Mitchell,* 83 U.S. (16 Wall.) at 547 (stating that where the sale is without restriction, "the rule is well established that the patentee must be understood to have parted to that extent with all his exclusive rights, and that he ceases to have any interest whatever in the patented machine so sold and delivered").

HP correctly states that ROT's modification is not conventional repair. The caps on the purchased cartridges are not broken or defective. On the other hand, neither is ROT's modification a "reconstruction" of the patented combination. A reconstruction occurs after the patented combination, as a whole, has been spent, when "the material of the combination ceases to exist." *Wilson v. Simpson,* 50 U.S. (9 How.) 109, 123, 13 L.Ed. 66 (1850). While there is no bright-line test for determining whether a modification is a "reconstruction" sufficient to infringe a patent owned by the seller of the product, on the undisputed facts in this case, we agree with the district court that ROT has not reconstructed the cartridges. ROT's modification of the caps of HP's cartridges is more akin to permissible "repair" than to impermissible "reconstruction." *See Kendall Co. v. Progressive Med. Tech. Inc.,* 85 F.3d 1570, 1575, 38 USPQ2d 1917, 1921 (Fed.Cir.1996) (stating that "as long as reconstruction does not occur or a contract is not violated, nothing in the law prevents a purchaser of a device from prematurely repairing it"). While HP had the right to be free from competition from those who would reconstruct spent products, ROT did not do that. Even accepting that ROT's actions constitute a "making" of the accused cartridges, they were made from new and unused HP cartridges purchased from a legitimate source, and the property of ROT; the HP cartridges were certainly not spent. Furthermore, ROT does not *replace* any of the elements

recited in the claims; the housing, printhead, standpipe, ink reservoir, and flexible strip are all original components of the purchased cartridges. Using the original housing, ROT only changes the way in which the cap of an unused, new cartridge is connected to the remainder of the cartridge. This modification allows ROT's customers to use the cartridges for the duration of the life of the patented combination, rather than be limited by the duration of the ink supply in the cartridge.

The Supreme Court decision in the case of *Wilbur–Ellis Co. v. Kuther,* 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419, 141 USPQ 703 (1964), decided on the same day as *Aro II,* is instructive on this point. In that case, the patentee sued the purchaser of patented fish-canning machines after the purchaser modified the machines. As originally constructed, the machines packed fish into one-pound cans. The purchaser had six of thirty-five elements of the machines resized so that the machines would pack fish into smaller five-ounce cans. Declining to treat the unrestricted sale of the machines as a license for use on one-pound cans only, the Supreme Court held:

> When six of the 35 elements of the combination patent were resized or relocated, no invasion of the patent resulted, for as we have said the size of cans serviced by the machine was no part of the invention; nor were characteristics of size, location, shape and construction of the six elements in question patented. Petitioners in adapting the old machines to a related use were doing more than repair in the customary sense; but what they did was kin to repair for it bore on the useful capacity of the old combination, on which the royalty had been paid.

*Wilbur-Ellis,* 377 U.S. at 424–25, 84 S.Ct. 1561, 1563, 141 USPQ at 704–05. Likewise, ROT's modification of the original HP cartridges improved their usefulness by allowing ROT and its customers to use them for their own purposes. It was "kin to repair." We find HP's arguments attempting to distinguish *Wilbur–Ellis* unconvincing.

HP argues that the machines in *Wilbur–Ellis* had not reached the end of their intend-

ed life, whereas the intended and useful life of its cartridges ends as soon as a single reservoir of ink is depleted because at that point, print quality cannot be assured. It asserts that "Hewlett–Packard engineered the Kukla and Stanley cartridges so that no component would fail prior to delivery of all of the ink contained therein." While such engineering may be testimony to the quality of HP's product, and ROT's actions may affect HP's warranties, this argument does not support HP's legal position. HP's unilateral intentions cannot change the fact that ROT has only modified an unused cartridge that HP sold without restriction. HP fails to recognize the distinction between what it intended to be the life of the cartridge, as determined by the ink supply, and its actual useful life. As HP's assertion makes clear, the cartridges are specifically designed so that the ink is depleted not only *before* the patented combination as a whole is spent, but *before* any single component of it is spent (such as the printhead). Thus, the useful life of the patented combination is substantially longer than the life of a single reservoir of ink.

■ HP also argues that the boundary between "permissible repair" and "impermissible reconstruction" turns on the intention of the patentee. HP contends that it has clearly manifested its intent that the ink jet cartridges be non-refillable. The package insert accompanying the cartridges suggests that the cartridges be discarded once they are empty; HP does not sell refillable cartridges, and HP does not sell ink refills. Because it has always manifested an intent that its cartridges be discarded, it argues, the creation of refillable or refilled cartridges are unauthorized acts which constitute an infringement of its patents. HP in effect argues that any change to a patented product that is not intended by the patentee constitutes reconstruction. In support of its theory, HP cites *Wilson*, 50 U.S. (9 How.) at 125–126, as establishing an "intent-of-the-patentee analysis" for determining whether conduct is to be considered a "repair" or a "reconstruction." We do not agree; HP has misread *Wilson*. Although at times speaking in terms of the intention of the inventor, the Court focused on the nature of the device sold, and specifically on the fact that the machine was designed such that one group of components, the knives, would wear out long before the remaining components:

> The proof in the case is, that one of [the inventor's] machines, properly made, will last in use for several years, but that its cutting-knives will wear out and must be replaced at least every sixty or ninety days.
>
> . . .
>
> [If such a] part of the combination is meant to be . . . frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain.

*Wilson*, 50 U.S. (9 How.) at 125–26. Although HP cites *American Cotton–Tie Co. v. Simmons*, 106 U.S. (16 Otto.) 89, 94, 1 S.Ct. 52, 56–57, 27 L.Ed. 79 (1882), as additional support for its "intent-of-the-patentee" theory, the Supreme Court, in *Aro I*, referred to *American Cotton–Tie* by noting that "the fact that the [devices] were marked 'licensed to use once only' was deemed of importance by the Court." *Aro I*, 365 U.S. at 343 n. 9, 81 S.Ct. at 603 n. 9, 128 USPQ at 358 n. 9. Thus, absent a restriction having contractual significance, a purchase carries with it the right to modify as long as reconstruction of a spent product does not occur. *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 24 USPQ2d 1173 (Fed.Cir.1992) (stating that should "single use only" restriction be enforceable on remand, reuse of device would be a breach of contract and therefore unauthorized). The question is not whether the patentee at the time of sale intended to limit a purchaser's right to modify the product. Rather the purchaser's freedom to repair or modify its own property is overridden under the patent laws only by the patentee's right to exclude the purchaser from making a new patented entity. Each case turns on its own particular facts, but a seller's intent, unless embodied in an enforceable contract, does not create a limitation on the right of a purchaser to use, sell, or modify a patented product as long as a reconstruction of the patented combination is avoided. A noncontractual intention is simply the seller's hope or wish, rather than an enforceable restriction.

HP's arguments based on decisions of this court are similarly unavailing. In *Sage Products, Inc. v. Devon Industries, Inc.*, 45 F.3d 1575, 33 USPQ2d 1765 (Fed.Cir.1995), we held that an inner container of a patented medical waste disposal system was effectively spent when filled and thus could be replaced or repaired without infringing the patent. In response to the patentee's argument that the inner containers were not spent, the court noted, *inter alia*, that the patentee admitted that it intended that customers replace the inner containers. 45 F.3d at 1578, 33 USPQ2d at 1767. The patentee's intent was relevant, not to limit use by the purchasers, but to show that the patentee expected the product to be repaired. Neither that decision nor other decisions of this court cited by HP suggest that a patentee's intent alone limits the scope of the implied license that accompanies the sale of goods.

Accordingly, even though HP clearly intends the filled cartridges which it sells to be discarded after a single use, HP cannot use the patent laws to impose restrictions on the cartridges' use after selling them unconditionally. The modification made by ROT, essentially replacing the type of seal holding the cap onto an unused cartridge, is not a "second creation of the patented entity" so as to constitute an infringement of HP's ink jet pen patents. *See Aro I*, 365 U.S. at 346, 81 S.Ct. at 604–05, 128 USPQ at 359. Were we to rule in HP's favor in this case, we would be depriving ROT of the right to use and resell its own property, an unused product it purchased free of restriction, and enable HP to limit the use of a product it freely sold without restriction.

B. *The '503 Ink Patent*

HP argues that summary judgment of non-infringement of the '503 patent was improperly granted because the court ignored evidence of infringement proffered by HP, including "admissions" of infringement by two of ROT's ink chemists. We find no error in the district court's conclusion that, viewing the evidence in a light most favorable to HP, it has failed to meet its burden to show the existence of genuine issues of fact for trial. Regarding the "admissions," HP cites deposition testimony by a former ROT chemist in which the chemist stated that he believed that ROT's black ink refill "fell within the claims" of the '503 patent. However, during the same deposition and when questioned claim by claim, he could not identify a single claim that read on ROT's inks. He further explained in detail why the chemical compositions of ROT's inks did not meet each element of the asserted claims as he understood them. Upon questioning regarding the discrepancy in his testimony, the chemist explained that he did not understand the examining attorney's use of the phrase "fall within the claims" to mean that every limitation of each claim was met by the accused product. Thus, the chemist offered unrebutted testimony that the accused ink was not within the scope of the asserted claims. His earlier conclusory response, based on a misunderstanding of the question asked and immediately shown to be an inaccurate summary of his views, does not raise a genuine issue of material fact.

The other evidence cited by HP is the statement by an ROT chemist that ROT's president had told her on her first day of work that "there was a problem, there was patent infringement" regarding an ink jet ink formula developed by another chemist. This statement is hardly an admission that the accused products infringe the asserted claims of the patent at issue. HP has failed to provide any evidence that creates a genuine issue of fact concerning whether the accused products contain inks that are covered by the asserted claims of the '503 patent.

C. *The Remaining Patents In Suit*

The remaining nine patents allegedly cover various components of ink jet cartridges. ROT does not appear to dispute this. In its Statement of Undisputed Material Facts submitted to the district court, ROT admitted that "[t]he claims of [the patents in suit] claim either structure of the elements of the cartridges or methods of making same." However, ROT contends that its modification does not affect these elements, and HP does not allege otherwise. Rather HP argues that the modified cartridges are "new" devices that infringe these patents as well. As previously discussed, this argument misses the mark. HP has not introduced any evidence

to show that ROT's limited modification constitutes reconstruction of the patented cartridges.

■ With regard to the '295 patent, HP argues that ROT's activities infringe process claims directed to "providing" ink reservoirs with ink and "filling" ink reservoirs with ink. This argument is also unpersuasive. Unauthorized use of the cartridges covered by the apparatus claims would necessarily infringe the asserted process claims. As previously articulated, however, when a patentee sells a device without condition, it parts with the right to enforce any patent that the parties might reasonably have contemplated would interfere with the use of the purchased device. While HP may assert that it didn't intend that the cartridges be refilled, there was no agreement on that point. Moreover, a license was impliedly granted under the patent for the additional reason that it contained apparatus claims as well as process claims covering use of the cartridges. Accordingly, HP "authorized" the practice of any method claims in the '295 patent when it sold the cartridges unconditionally. *Univis Lens Co.*, 316 U.S. at 249, 62 S.Ct. at 1093 (stating that "upon familiar principles the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold"). Finally, HP has not met its burden of showing the existence of an issue of material fact with regard to the asserted method claims of the '295 patent.

## CONCLUSION

The district court did not err in granting ROT's motion for summary judgment of non-infringement of all twelve asserted patents and in denying HP's contrary motion regarding two of the patents. HP sold ink jet cartridges without condition or restriction. ROT lawfully purchased the cartridges and modified them in a manner that was more akin to permissible repair than to impermissible reconstruction. Therefore, ROT's modification and sale of the cartridges did not infringe the asserted claims of the two "ink jet pen" patents or the asserted process claims allegedly covering the use of the cartridges. Because it is undisputed that the modification did not effect a reconstruction of any claimed subject matter in the nine pat-

ents allegedly covering components of the cartridges, these claims were not infringed as well. In addition, the district court did not err in holding that HP failed to raise a genuine issue of fact regarding infringement of the asserted ink patent. Accordingly, the decision of the district court is affirmed.

*AFFIRMED.*