**FUJI MACHINE MANUFACTURING CO., LTD., Plaintiff,**

v.

**HOVER–DAVIS, INC., et al., Defendants.**

No. 96–CV–6087L.

United States District Court, W.D. New York.

Aug. 23, 1999.

Henry R. Ippolito, Chamberlain, D'Amanda, Oppenheimer & Greenfield, Rochester, NY, James A. Oliff, Darle M. Short, Glenn T. Barrett, Edward P. Walker, David C. Gardiner, Oliff & Berridge, Alexandria, VA, for Fuji Machine Manufacturing Co., Ltd., plaintiff.

James Metzler, Boylan, Brown, Code, Fowler, Vigdor & Wilson, LLP, Rochester, NY, for defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

This is a patent infringement action. Plaintiff, Fuji Machine Manufacturing Co., Ltd. ("Fuji"), commenced this action pursuant to 35 U.S.C. §§ 271 and 281 against Hover–Davis, Inc. ("Hover–Davis"), alleging that HD has infringed Patent No. 4,740,136 ("the '136 patent"), which is held by Fuji. Several motions are now pending before the court. Fuji has filed a motion for summary judgment in its favor on the issue of infringement, and a separate motion for summary judgment seeking dismissal of Hover–Davis's repair defense and its implied-license defense. Hover–Davis has also moved for summary judgment and for attorney's fees.

## FACTUAL BACKGROUND

The '136 patent is directed to tape feeders for chip placement machines. These machines produce circuit boards by removing electronic components, or chips, from their packaging and placing them on blank circuit boards. The chips come packaged in "carrier tapes," which have pockets on them containing the individual chips. A strip of film on the outside of the carrier tape holds the chips in place. Each tape is wound on a reel, and may contain hundreds or thousands of chips.

Each chip placement machine contains a number of tape feeders. Each feeder unwinds a single carrier tape reel, removes the cover film to expose the pockets containing the chips, and positions the exposed pockets under suction members of the chip placement machine. The suction members then pick the components out of the carrier tapes and place them in the proper locations on the blank circuit boards.

The '136 patent includes apparatus claims 9–12 and method claims 1–8 (4–6 of which are not relevant to this case). The apparatus claims relate to an apparatus for removing electronic components from carrier tapes, specifically, the tape feeder described in the '136 patent in combination with a suction member of a chip placement machine (neither the tape feeder, the suction member, nor the chip placement machine is separately patented). The method claims describe how this combination is used to remove the components from the carrier tapes.

Both Fuji and Hover–Davis manufacture tape feeders that are designed to be used in conjunction with certain Fuji chip placement machines. Fuji's products are called "CP" tape feeders and chip placement machines, and Hover–Davis's tape feeders are named "HDF" tape feeders. Fuji alleges that by selling the HDF tape feeders, Hover–Davis is infringing the '136 patent in a number of ways. First, Fuji alleges, the

sale of and offers to sell the HDF feeders are acts of contributory infringement under 35 U.S.C. § 271(c) because the HDF tape feeders are: (1) a component of a patented combination, *i.e.* the tape feeder and a suction member as defined by claims 9–12; (2) a material apparatus used to practice a patented process, *i.e.*, the method of using a tape feeder and suction member described in claims 1, 2, 3, 7 and 8; (3) a material part of the patented combination and process; and (4) not a staple article or commodity of commerce suitable for substantial noninfringing use, because the HDF feeders can only be used on a Fuji CP chip placement machine. Fuji also alleges that Hover–Davis has induced others to infringe claims of the '136 patent through its sale, promotion, marketing, maintenance and service of the HDF tape feeders, in violation of 35 U.S.C. § 271(b).

## DISCUSSION

### I. Laches/Equitable Estoppel

Two of the primary bases for Hover–Davis's motion for summary judgment dismissing Fuji's complaint are its assertions that Fuji should be barred from bringing this action both by reason of laches and by the principle of equitable estoppel. According to Hover–Davis, Fuji waited an inordinately long time to commence this action, and in fact affirmatively led Hover–Davis to believe that Fuji did not consider Hover–Davis's manufacture and sale of its HDF tape feeders to violate the '136 patent.

### Factual Contentions

Hover–Davis alleges that Fuji became aware of Hover–Davis's intentions to sell tape feeders compatible with Fuji chip placement machines as early as 1991, but it took no steps to enforce its patent until late 1995. Hover–Davis and Fuji had had some prior contacts, dating back to about early 1990, relating to Hover–Davis's development of "C–PAK" conversion kits, which were designed to modify tape feeders to accomodate a different type of carri-

er tape than had been used previously (the C–PAK products are not at issue in this lawsuit). Apparently Fuji had cooperated with Hover–Davis to some extent in the design of the C–PAK conversions, which presumably enhanced the usefulness, and therefore the marketability, of Fuji's machines.

In a letter dated March 3, 1991, Hover advised Iwao Yamaguchi, who was then the president of Fuji America, that Hover–Davis had "introduced a feeder that is compatible with the [Fuji] CP series machine," and that Hover "would like the opportunity to discuss the option of marketing this feeder through Fuji America." John D. Hover Affidavit (Item 54) Ex. I. Hover and Yamaguchi apparently met on April 8, 1991, for in a letter dated April 12, 1991, referencing that meeting, Hover stated that Hover–Davis had "decided that it is our preference to continue to market a HOVER–DAVIS feeder product." *Id.* Ex. J. Hover said that because Hover–Davis has "spent two years and considerable expense in developing" its feeder, "it is the opinion of HOVER–DAVIS that no monetary compensation should be forthcoming related to copying the Fuji design. However, we would agree to negotiate a level of monetary compensation for the cooperation in future development of feeders for the [Fuji] machines. The level of compensation would be tied to HOVER–DAVIS [Fuji-] compatible feeder sales only and directly related to the level of cooperation agreed upon." *Id.* Hover added that Hover–Davis "would also like to explore the possibility of marketing our feeders through the Fuji manufacturing rep groups already established." *Id.*

At some point in this process, Yamaguchi advised Hover of the existence of the '136 patent. Hover then contacted Howard Greenwald, Esq., an attorney who had done a patent infringement search for Hover in October 1989, when Hover was first considering developing a Fuji-compatible tape feeder. Greenwald's prior report noted the '136 patent, but concluded, with-

out extensive discussion, that Hover–Davis's "manufacture or sale of your device would not infringe any of the claims of this patent," and that a "customer's reconstruction and/or use of a modified Fuji CP–II machine also would not infringe the claims of this patent." *Id.* Ex. D.

After Hover relayed to Greenwald Yamaguchi's reference to the '136 patent, Greenwald undertook a more extensive study, but again concluded (for reasons that are of little importance insofar as the estoppel/laches issues are concerned) that "Hover–Davis Inc.'s manufacture and sale of its tape feeder does not infringe either the process or the apparatus claims of United States patent 4,740,136." *Id.* Ex. M.

Hover alleges that he informed Yamaguchi of Greenwald's conclusion, and that Yamaguchi agreed that Hover–Davis was not infringing the '136 patent, and that there was "no problem" with Hover–Davis's manufacture of tape feeders. *Id.* ¶ 32.

Hover also alleges that "Fuji continued to seriously entertain Hover–Davis' proposal for the manufacture of tape feeders," *id.* ¶ 34, and that throughout this time, Fuji never raised any further objections or concerns about possible patent infringement. Had Fuji done so, he claims, Hover–Davis, which at that time was little more than a "mom and pop" operation with very little money, would simply have attempted to pursue the manufacture of tape feeders for other companies' machines, rather than get involved in a possible legal battle with Fuji. Since Fuji apparently did not object to Hover–Davis's plans, however, Hover–Davis seriously committed its resources to going ahead with the Fuji-compatible machines.

Hover states that at Fuji's request, he sent Fuji two sample Hover–Davis tape feeders for Fuji's evaluation in 1991. In December 1991, Hover traveled to Japan to meet with Fuji executives concerning the C–PAK project, and he alleges that no one from Fuji expressed any concerns about the Hover–Davis tape feeders.

The parties agree that Fuji never gave Hover–Davis an express response concerning Hover's proposal to sell Hover–Davis tape feeders through Fuji. In early 1992, therefore, Hover decided to go ahead with the manufacture and sale of the feeders independently. Fuji allegedly did not object to Hover–Davis's sale of its feeders initially.

According to Hover, the first sign of trouble in this regard came in December 1993, when he wrote to Yamaguchi after Hover had learned from some of Hover–Davis's customers that Fuji representatives had been disparaging Hover–Davis's tape feeders and telling them that their use of Hover–Davis feeders might void the warranty on their Fuji machines. By letter dated December 17, 1993, Hover wrote to Yamaguchi asking him to "document[ ] the position of Fuji America relative to HOVER–DAVIS, INC. products." *Id.* Ex. T. The letter did not specifically refer to patent issues. Yamaguchi responded in a letter dated December 20, 1991 that "Fuji-built equipment with third-party accessories or parts may lose Fuji's warranty coverage for malfunctioning and/or damage that has been found attributable to the use of such parts or accessories, even if the rest of the machine or its functioning remain under warranty." *Id.* Ex. U.

Hover states that Fuji said nothing further about patent infringement by Hover–Davis until December 1995, when Fuji's attorney sent Hover–Davis a cease-and-desist letter demanding that Hover–Davis stop marketing its Fuji-compatible tape feeders by December 31, 1995. *Id.* Ex. X. By then, Hover states, Hover–Davis, having relied on Fuji's seeming acquiescence in Hover–Davis's manufacture and sale of the HDF tape feeders, had fully committed itself to the HDF tape feeder business.

### Legal Analysis of Laches and Equitable Estoppel Defenses

▇ The Court of Appeals for the Federal Circuit has held that the defenses of

laches and equitable estoppel are both applicable in patent infringement actions. These defenses, while similar in some respects, have distinct elements and operate in different ways.

 A defendant asserting laches must prove that:

1. the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant; and
2. the delay operated to the prejudice or injury of the defendant.

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed.Cir. 1992). The Federal Circuit has held, however, that "laches bars relief on a patentee's claim only with respect to damages accrued prior to suit," and does not bar recovery altogether. *Id.* at 1041.

 The court in *Aukerman* also set forth the elements of equitable estoppel as that doctrine applies to patent cases. First, the court said, the patentee must, through its actions or inaction, have misleadingly communicated to the accused infringer that the patentee did not intend to press an infringement claim. Second, the accused infringer must show that it detrimentally relied on the misleading action of the patentee. Finally, the accused infringer must show that it would be materially prejudiced if the patentee were permitted to proceed. *Id.* at 1042–43. Unlike laches, "[w]here equitable estoppel is established, all relief on a claim may be barred." *Id.* at 1041.

 Applying these principles to the case at bar, I find that there are issues of fact surrounding both these defenses that preclude. summary judgment. As with many other aspects of this case, the parties are in sharp disagreement about many of the relevant events.

It is clear that the existence of factual issues will bar summary judgment with respect to the defenses of laches and equitable estoppel. Because "[b]oth defenses ultimately turn on underlying factual determinations, ... [s]ummary judgment ... is appropriate only when there is no genuine issue of material fact *and* when the movant is entitled to judgment as a matter of law." *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1292 (Fed. Cir.1992). *See, e.g., Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*, 988 F.2d 1157, 1164 (Fed.Cir. 1993) (there was clear dispute as to factual questions material to laches, and district court therefore erred in granting summary judgment dismissing cross-complaint); *Accuscan, Inc. v. Xerox Corp.*, No. 96 Civ. 2579, 1998 WL 60991, at *5 (S.D.N.Y. Feb. 11, 1998) (viewing evidence in light most favorable to plaintiff, court found that plaintiff had met its burden of coming forward with evidence to raise genuine factual issue respecting reasonableness of its conduct in waiting several years before filing suit); *R2 Med. Systems, Inc. v. Katecho, Inc.*, 931 F.Supp. 1397, 1412 (N.D.Ill. 1996) (denying defendant's motion for summary judgment based on laches where issue of fact remained as to whether defendant suffered material prejudice as result of delay by plaintiff in filing suit); *James River Corp. of Virginia v. Hallmark Cards, Inc.*, 915 F.Supp. 968, 980–84 (E.D.Wisc.1996) (defendant had not carried its burden of showing that there were no genuine issues of material fact as to its laches and equitable estoppel defenses).

In the case at bar, defendant alleges that Fuji not only failed to assert its patent rights but affirmatively indicated to Hover–Davis that Fuji had no objection with Hover–Davis selling its tape feeders. Plaintiff, on the other hand, denies ever making any such representation to Hover–Davis. In particular, plaintiff denies that Yamaguchi ever told Hover that there was "no problem" with Hover–Davis selling Fuji-compatible feeders. Yamaguchi himself denies even having any opinion on the subject of infringement because that is a technical matter outside of his area of expertise. *See* Yamaguchi Declaration,

Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment Ex. 5, ¶ 6.

In addition, Fuji contends that it simply met Hover–Davis's repeated proposals to enter into some sort of joint venture to sell Hover–Davis's tape feeders with complete silence. Although "equitable estoppel may in some instances be based upon a misleading silence, mere silence must be accompanied by some *other* factor which indicates that the silence was sufficiently misleading as to amount to bad faith." *Hemstreet,* 972 F.2d at 1295. For instance, the patentee may threaten immediate enforcement of its patent rights, but then do nothing for a long period of time, leading the accused infringer to believe that the patentee had merely made an idle threat. *Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570, 1574 (Fed.Cir.1987).

The evidence presented by Hover–Davis on these issues may be determined by the fact-finder to be more than mere silence but, as the case now stands, the proof is hardly conclusive. It is clear that "on summary judgment, such inference [that the patentee does not intend to bring an infringement claim] must be the *'only* possible inference from the evidence.'" *James River,* 915 F.Supp. at 981 (quoting *Aukerman,* 960 F.2d at 1043–44).

There are also factual issues relating to Hover–Davis's reliance on Fuji's alleged representations, and to whether Hover–Davis has suffered any prejudice as a result. Hover–Davis contends that it devoted substantial money and other resources in developing its HDF tape feeders in reliance on Fuji's alleged indication that it did not believe Hover–Davis to be infringing the '136 patent. Hover–Davis argues that it would simply have abandoned its efforts to produce Fuji-compatible tape feeders had Fuji raised the patent infringement issue earlier, and that it is now prejudiced because it has already committed itself to the HDF line of products.

Although economic loss is one type of prejudice that can support an equitable estoppel or laches defense, *see James River,* 915 F.Supp. at 978, it is not enough simply to show that the alleged infringer changed its economic position somewhere along the line, or that it may suffer some economic harm if the plaintiff is allowed to proceed with its patent infringement suit. More is required. For purposes of laches, the defendant must also show that its change of position was occasioned by the plaintiff's delay in commencing suit. *Id.* To establish equitable estoppel, the defendant must also show that it took some action in reliance on the patentee's allegedly misleading communications. *Id.* at 982.

In the case at bar, Fuji contends that Hover–Davis's decision to market its HDF tape feeders was based not upon anything that Fuji did or did not do, but upon the opinion of Fuji's attorney that the HDF feeders did not infringe any of Fuji's patents. According to Fuji, then, Hover–Davis simply made a business decision that had nothing to do directly with Fuji itself.

If in fact Hover–Davis's decisions were made without any reliance at all on the representations or inaction of Fuji, Hover–Davis could establish neither a laches nor an estoppel defense. With respect to laches, the defendant's change of position "must be because of and as a result of the [patentee's] delay, not simply a business decision to capitalize on a market opportunity." *Hemstreet,* 972 F.2d at 1294. Similarly, to establish estoppel, the defendant must prove that its actions were taken *"in reliance upon* supposed actions of [the patentee] rather than a business judgment of its own—a judgment which subsequent events may well prove to have been faulty." *Id.* at 1294–95 (footnote omitted). Likewise, while reliance on advice of counsel does not necessarily preclude a finding that the accused infringer also relied detrimentally on the patentee's representations, *see Wafer Shave, Inc. v. Gillette Co.,* 857 F.Supp. 112, 123 (D.Mass.1993), *aff'd,* 26 F.3d 140 (Fed.Cir.1994), it at least raises an issue of fact as to reliance. *See THK*

*America, Inc. v. NSK Co. Ltd.*, 157 F.R.D. 637, 649 (N.D.Ill.1993) ("If defendants instead relied on favorable opinions from patent counsel, detrimental reliance may be absent"); *Symbol Technologies, Inc. v. Metrologic Instruments, Inc.*, 771 F.Supp. 1390, 1399 (D.N.J.1991) ("Defendants' own brief ... raises an issue as to whether they relied more on the advice of their own patent counsel than on Symbol's conduct").

Certainly some of Hover–Davis's allegations concerning Fuji's reactions (or lack thereof) to Hover–Davis's development of the HDF tape feeders, if true, are troubling. If Yamaguchi in fact told Hover that there was "no problem" as far as Fuji was concerned, or if Fuji sat on its rights initially, either because it thought that a joint venture might work to Fuji's advantage or because it simply viewed Hover–Davis as too small an operation to present much of a threat to Fuji, and it only raised the patent issue when the joint venture failed to materialize or when Hover–Davis began cutting into Fuji's sales, Hover–Davis may well be able to establish its laches and equitable estoppel defenses.

At this stage, however, on the record before me, these factual issues remain unresolved. Moreover, there are also issues about Hover–Davis's conduct, particularly whether it acted in reliance on Fuji's statements. Keeping in mind that on this motion for summary judgment I must view the record in the light most favorable to Fuji, the nonmoving party, I therefore conclude that there are issues of fact relating both to laches and equitable estoppel. Defendant's motion for summary judgment on these defenses is therefore denied.[1]

## II. Direct Infringement

Both parties contend that they are entitled to summary judgment with respect to the issue of infringement. The central issue here is whether the record conclusively shows either the presence or absence of direct infringement of the '136 patent. Both sides agree that without direct infringement by someone, Fuji cannot prevail on its claims for inducement of infringement and contributory infringement against Hover–Davis. Hover–Davis contends that Fuji's claims must fail because there is no evidence here that direct infringement has occurred. Fuji asserts precisely the opposite: that the record unequivocally establishes direct infringement.

A patent can be infringed in three ways: direct infringement, inducement of infringement, and contributory infringement. Direct infringement occurs whenever someone "without authority makes, uses, offers to sell, or sells any patented invention." 35 U.S.C. § 271(a). Inducement of infringement occurs whenever someone "actively induces infringement of a patent." 35 U.S.C. § 271(b). Contributory infringement occurs whenever someone "offers to sell or sells ... a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c).

■ Here, Fuji does not attempt to state a claim for direct patent infringement against Hover–Davis, but instead as-

---

1. Hover–Davis also argues that it is entitled to summary judgment because Fuji's encouragement of Hover–Davis's development and manufacture of the HDF tape feeders precludes Fuji from having a good-faith basis to prosecute its patent infringement claim. Hover–Davis has not cited any authority for this argument, however, and since it is to a great extent based upon the same facts underlying

Hover–Davis's laches and estoppel defenses, I deny Hover–Davis's motion for summary judgment on that ground for the reasons discussed with respect to those two defenses.

I also note that defendant has moved for attorney's fees. Since that motion is contingent upon the court granting Hover–Davis's motion for summary judgment, the motion for attorney's fees is denied.

serts claims for inducement of infringement and contributory infringement. It is well established that in order for a plaintiff to prevail on either of these theories, direct infringement must be proved. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961); *Kendall Co. v. Progressive Med. Tech., Inc.*, 85 F.3d 1570, 1573 (Fed.Cir.1996); *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir.1993); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed.Cir.1990); *Moleculon Research Corp. v. CBS, Inc.*, 872 F.2d 407, 410 (Fed. Cir.1989); *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir.1986); *Fuji Mach. Mfg. Co., Ltd. v. Hover–Davis, Inc.*, 936 F.Supp. 93, 94–95 (W.D.N.Y.1996).

Fuji alleges that purchasers of HDF tape feeders directly infringe claims 1–3 and 7–12 of the '136 patent when they install and operate the tape feeders on a Fuji chip placement machine. Fuji maintains that the combination of an HDF tape feeder and the suction member of CP machine includes all of the elements of apparatus claims 9–12, and, when this combination is operated, all of the steps of claims 1, 2, 3, 7 and 8.

Hover–Davis contends that there is no direct infringement here, for several reasons. First, Hover–Davis states that under the "patent exhaustion" doctrine, Fuji, by selling its chip placement machines without any restrictions placed on their use, ceased to have any rights with respect to the manner in which its customers use the machines after the sale was completed. *See Intel Corp. v. ULSI System Technology, Inc.*, 995 F.2d 1566, 1568 (Fed.Cir. 1993), *cert. denied*, 510 U.S. 1092, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994). Hover–Davis also contends that as a matter of law, Fuji has granted its customers an implied license to practice the patented process and to use the claimed apparatus that are covered by the '136 patent. *See Met–Coil Systems Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684 (Fed.Cir.1986). In addition, Hover–Davis states that Fuji's customers' replacement of worn-out Fuji tape feeders with HDF feeders is permissible by virtue of their right to repair their machines. *See Aro*, 365 U.S. at 346.

Although the parties in this case have addressed these doctrines—patent exhaustion, implied license, and the right to repair—as separate issues, they are closely related. For example, the Court of Appeals for the Federal Circuit, discussing the patent exhaustion rule that " 'an authorized sale of a patented product places that product beyond the reach of the patent,' " *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 921 (Fed.Cir.1995) (quoting *Intel*, 995 F.2d at 1568), *cert. denied*, 516 U.S. 1174, 116 S.Ct. 1268, 134 L.Ed.2d 215 (1996), in the next sentence stated that "[u]nder this *implied license*, a patent holder receives a reward for inventive work in the first sale of the patented product," after which the patentee ceases to have any interest in the product. *McCoy*, 67 F.3d at 921 (emphasis added). Similarly, the court has stated that a buyer's implied license to use a patented device includes the right to repair the device, but not the authority to make a new device or to reconstruct one which has been spent. *Hewlett–Packard Co. v. Repeat–O–Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1451 (Fed.Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1304, 140 L.Ed.2d 470 (1998).

■ Because of the interrelatedness of these issues, their resolution to a great extent turns on the same questions of fact. Ultimately what is at issue in this case is the nature and extent of Fuji's customers' right to modify their CP machines, and whether their use of HDF tape feeders falls within the scope of that right. In particular, the crucial question is whether the replacement of CP feeders with HDF feeders constitutes a permissible repair or an impermissible reconstruction.

"The authority to use and sell a purchased device ... does not include the right to make a new device or to recon-

struct one which has been spent." *Hewlett–Packard*, 123 F.3d at 1451. The Supreme Court, however, has taken a narrow view of what constitutes a reconstruction as opposed to a permissible repair. "[R]econstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to 'in fact make a new article,' after the entity, viewed as a whole, has become spent." *Aro*, 365 U.S. at 346, 81 S.Ct. 599. Therefore, "[m]ere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property." *Id*.

Fuji contends that its customers' use of HDF tape feeders to replace Fuji CP tape feeders is not a repair because the removed CP tape feeders are not worn out, broken or spent. Rather, Fuji asserts, CP feeders are removed for purposes of operational efficiency. For example, according to Fuji, different types of circuit boards require the use of different components. Therefore, when a circuit board maker wants to switch from manufacturing one type of circuit board to another, rather than changing the reels of carrier tape on the tape feeder, the entire tape feeder is replaced, because it is faster and therefore more efficient to do so. Similarly, Fuji claims, when a carrier tape on a tape feeder runs out of chips, the entire tape feeder is usually removed and another feeder is attached to the CP machine, because the feeders snap on to the machine easily, whereas changing the reel of carrier tape is a more elaborate procedure.

Although Fuji makes a number of assertions about how and why its customers replace Fuji tape feeders with Hover–Davis tape feeders, I am not convinced that a finder of fact could not reasonably conclude otherwise. For example, Fuji's contention that Fuji tape feeders are not removed because they are worn out, broken or spent, but for the efficiency's sake, is neither self-evident nor the only conclu-

sion that could reasonably be drawn from the evidence. In support of this assertion, Fuji has submitted a declaration of its expert witness, Ray Rua. Rua makes this same assertion about tape feeders being replaced for purposes of efficiency, but he does not state the basis for his knowledge of this matter. Although Rua clearly has an extensive background in dealing with the technology involved in this case, particularly with respect to matters pertaining to design and the development and implementation of new methods, it is not evident that he has such an extensive, personal knowledge of how customers actually utilize the machines, and specifically when and why they replace tape feeders, that his assertions in this regard could not be challenged, or that a reasonable finder of fact could not reject them.

Likewise, Rua states that when a tape feeder becomes nonfunctional, the user does not replace the entire feeder, but simply replaces the individual part that is causing the problem. At his deposition, Rua indicated that he dealt with owners of Fuji chip placement machines, and that based on his experience, they would replace individual, nonworking parts rather than entire tape feeders. Hover–Davis's expert, Bradley J. Foster, asserts otherwise, however, stating that Hover–Davis feeders "are used to replace Fuji feeders which are worn-out, damaged or which require excessive maintenance in their production practices." Report of Defendant's Technical Expert (Item 50) at 4. He states that he makes this statement based on his direct experience with the operation and maintenance of Fuji placement machines and of Fuji and Hover–Davis tape feeders. He also testified at his deposition that while he was employed at Harris Corporation during the early 1990s, it was his experience that Hover–Davis tape feeders were used to replace worn-out or damaged Fuji tape feeders. Bradley J. Foster Affidavit, sworn to Sept. 11, 1998, Attachment B at 89–101.

These matters also relate to one of the elements of plaintiff's claim for contributory infringement: whether the allegedly infringing product is "suitable for substantial noninfringing use." 35 U.S.C. § 271(c). Arguably, using the Hover–Davis feeders to replace broken Fuji feeders could be considered a legitimate repair, and hence a substantial noninfringing use. Since the two sides differ over how Hover–Davis's feeders are used, however, this too presents an issue of fact to be determined at trial. *See Hodosh v. Block Drug Co., Inc.,* 833 F.2d 1575, 1579 n. 12 (Fed.Cir.1987) (whether defendant's product had substantial noninfringing use raised fact question to be determined on remand), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988)

The parties' experts also disagree about the extent to which the use of a Hover–Davis tape feeder with a Fuji chip placement machine includes the elements of the '136 patent. Rusa contends that the combination of a Hover–Davis tape feeder and the suction member of a Fuji CP machine includes elements 1–3 and 7–12 of the patent. Foster, however, contends that some of the claimed elements are not present in the HDF feeder, such as a driving device, a suction member, and the combination of a notch, nozzle and chip. Foster Report (Docket Item 50) at 2–4. Foster's descriptions of how the feeders are designed and how they operate are at odds with Rusa's, and their credibility is

therefore a factor that may be taken into account in determining where the truth lies. Such credibility determinations, however, are properly left for the trier of fact based on the experts' live testimony at trial, and should not be made by the court on a motion for summary judgment. *See Allied Colloids Inc. v. American Cyanamid Co.,* 64 F.3d 1570, 1575 (Fed.Cir.1995) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict") (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Manchak v. N–Viro Energy Systems, Ltd.,* 876 F.Supp. 1123, 1129 (C.D.Cal.1994); *Mahurkar v. C.R. Bard, Inc.,* No. 92 C 4803, 1993 WL 259446 *7–8 (N.D.Ill. July 6, 1993); *Leading Edge Tech. Corp. v. Sun Automation, Inc.,* No. Civ. H–90–2316, 1991 WL 398682 *12 (D.Md. Sept.24, 1991)).[2]

In short, the relevant facts here are in dispute in a number of areas. Faced with conflicting factual allegations and expert opinions, it is not the role of this court to resolve these issues on a motion for summary judgment. Both parties' motions for summary judgment are therefore denied.

## CONCLUSION

Plaintiff Fuji Machine Manufacturing Co., Ltd.'s motions for summary judgment

2. Although not directly before me on the present motions, I note that Hover–Davis has asserted several antitrust counterclaims under the Sherman Act. There are circumstances in which a manufacturer's actions that force customers to buy replacement parts or other components only from itself can give rise to an antitrust violation. *See, e.g., C.R. Bard, Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1382–83 (Fed.Cir.1998) (upholding jury verdict finding antitrust violation by plaintiff, which had modified its product to prevent its competitors' components from being used with product), *cert. denied,* — U.S. —, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999); *Raybestos Products Co. v. Coni–Seal, Inc.,* 989 F.Supp. 166, 168–69 (D.Conn.1997) (denying motion to dismiss Sherman Act counterclaim

brought by manufacturer of automotive parts specifically designed as replacement parts for original parts manufactured by plaintiff). *See also Eastman Kodak Co. v. Image Tech. Services, Inc.,* 504 U.S. 451, 480–86, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (affirming reversal of summary judgment in favor of defendant/petitioner on Sherman Act claim alleging that defendant had attempted to monopolize service and parts markets in violation of Sherman Act, by making it difficult for anyone but itself to compete with defendant in servicing its equipment). Although I do not express any opinion at this point as to the merits of these counterclaims, I believe that their existence, and their relatedness to the patent claims here, further counsel against the entry of summary judgment in Fuji's favor.

on infringement (Item 52) and for summary judgment on defendant's repair and implied-license defenses (Item 53) are denied.

Defendant Hover–Davis, Inc.'s motion for summary judgment and for attorney's fees (Item 55) is denied.

IT IS SO ORDERED.